Okay, I would like the attorneys that are going to present oral argument, both for the appellant and the appellees, I would like those attorneys to come to the podium and Okay, now who are the attorneys for the appellants? John Amarillo for ICEA and for purposes of oral argument, IIDC as well. Okay, and who else? Matthew Price for Commonwealth Edison Company. Yes. Hi, and on behalf of the Coalition of Energy Suppliers, Chris Townsend. Okay, how have you divided up, I believe by court order we extended to 20 minutes aside? 22. 22 for our side. One was given two minutes, who was that? Raise your hand. Thank you. Okay, how are the others going to divide your time? I will divide this time equally with ICEA, so it will be 10 and 10. Who's going to speak first? I will, your honor. For how long? Eight minutes and reserve two for rebuttal. Following that, I will use my two minutes. Okay. And I'd like to use my eight minutes and reserve two for rebuttal. Okay, that will be fine. The attorney for the appellee. Sure, Tom Stanton on behalf of the Commerce Commission. Very good. Okay, both of you have 20 minutes. Both sides have 20 minutes. I extended two minutes to one counsel, so actually you've got 22 minutes if you want that time. But gentlemen, for the appellants, please reserve whatever time from that 20 that you want for your rebuttal. Do you understand? Yes, sir. Okay. Appellants, please proceed. Good morning, your honors. May it please the court, my name is John Amarillo, and I represent the Illinois Competitive Energy Association, ICEA, and for purposes of oral argument, the Illinois Industrial Energy Consumers as well. I would like to reserve two minutes for rebuttal, your honor. Your honors, this case concerns the Illinois Commerce Commission's approval of the Illinois Power Agency's 2013 Electricity Procurement Plan, which states that the commission has the extraordinary and unprecedented power to compel privately owned, competitively operated alternative retail electric suppliers called ARIES to purchase electricity from another privately owned facility, FutureGen, a planned retrofitted clean coal power plant. The order also says that for reasons of administrative convenience, the commission can alternatively use that same newly claimed power to force utilities to contract for FutureGen's energy on ARIES' behalf. The commission, in fact, has the power to do neither. With the sole exception of the initial clean coal facility, which does not exist, ARIES are, by their very nature, free to contract with whomever they choose. ARIES cannot be forced into contracts with facilities like FutureGen, nor can the commission avoid that fact and the express limits of its own power by compelling utilities to contract on ARIES' behalf. Before I reach the merits of those questions, Your Honors, I would just like to take a brief moment to address the standard of review, which was disputed by the parties in the briefing. The standard of review here today is unquestionably de novo. This court owes absolutely no deference whatsoever to the agency's interpretation of either the Public Utilities Act or the IPA Act. This is basic Chevron analysis. Courts will defer to an agency's interpretation of a statute only where that statute is ambiguous. The language of both statutes here is very clear. Both sides actually agree that this case can be decided on the plain language of the statutes. The fact that the parties disagree about the meaning of that language does not render either statute ambiguous, however, because the ICC's interpretation of the statutes is patently unreasonable. It's unreasonable because it relies on ignoring expressly defined terms in both statutes, terms the legislature took the time to define for us, and the ICC is not free to ignore. The first of those is that of a procurement plan, which really sets the table for this entire dispute. The legislature decided, in its wisdom and as a matter of law, that procurement plans do not apply to ARIES because they are central planning devices, and the legislature was attempting to create a competitive market in Illinois. The legislature was very clear on this point. Section 1-5 of the IPA Act, the Legislative Findings and Declarations, states that it is the purpose of the IPA as an agency to develop electricity procurement plans for electric utilities, not for ARIES. The same statute, rather, Section 1-75A, says, with regard to the IPA's procurement plan duties, that it is the duty of the IPA as an agency to, quote, develop procurement plans for eligible retail customers of public utilities. Again, neither ARIES nor their competitive customers are mentioned. The Public Utilities Act, Section 16-111.5A, Provisions Relating to Procurement, says the same thing. It says, one, procurement plans are for eligible retail customers. Two, eligible retail customers are the customers of public utilities. And three, ARIES customers, that is competitive customers, quote, shall not be included in procurement plan requirements, end quote. The legislature left ARIES out of the procurement planning process for a good reason. Again, it was creating a competitive market, and it wanted to move away from the kind of top-down control that the ICC is attempting to assert here. Another term that the ICC ignores in its interpretation of the relevant statutes is found in the retrofit provision of the Clean Coal Portfolio Standard, specifically Section 1-75D5 of that statute, which says that the ICC may approve utility sourcing agreements. Utility sourcing agreements. I repeat that because it is a doubly, if not more, defined term in both statutes. Utility is defined in Section 1-10 of the IPA Act and Section 3-105 of the Public Utilities Act to expressly exclude ARIES, and vice versa. Moreover, the term utility sourcing agreement, the phrase that the legislature used here, and the term ARIES sourcing agreement, the phrase the legislature did not use, are separately and exclusively defined in Section 1-10 of the IPA Act. So when the legislature was using the term utility and the term utility sourcing agreement, it was using terms that it explicitly defined multiple times to exclude ARIES, which the ICC now seeks to include with this order. The legislature drew a very bright line that the ICC now seeks to ignore or at the very least blur, and that is, I would submit, Your Honors, a very slippery slope, to ignore explicitly defined terms by the legislature and to ignore the difference between private entity and a public entity. Moreover, the ICC relies on the certification provision for ARIES in the Public Utilities Act. That's Section 16-115D5 of that statute, which states that applicants will source electricity from clean coal facilities in amounts equal to percentages set forth in the clean coal portfolio standard. But that, of course, speaks only to the amount of clean coal electricity that ARIES have to purchase. We concede that ARIES have the obligation to purchase clean coal electricity if it's available on the market, but we have the right to meet that obligation on our own terms. The legislature left the decision of how to reach that mark to ARIES' business judgment. That is an inherent part of the competitive market. It goes to the heart of what ARIES are. This statute does not say that ARIES must enter into sourcing agreements with retrofitted clean coal facilities, much less facilities of the ICC's choosing. Contrast that with Section 16-115D5-4 of the Public Utilities Act. This is the sister provision relating to the initial clean coal power plant. That provision specifically says, quote, all ARIES shall execute sourcing agreements to source electricity from the initial clean coal facility. So there you have an express statement, a clear statement of a contracting requirement, which brings into very sharp relief the total absence of a similar requirement for retrofitted facilities. What's the difference between an initial clean coal facility and a clean coal facility? The initial clean coal facility, Your Honor, was a specific project that was to be set up in Taylorville. It was called Tenaska. Is it defined in the statute? I'm sorry? Is it defined in the statute? It is, Your Honor. It's in Section 16-115D, if I remember correctly. That is not the kind of facility that we're talking about here today. I just use it to draw the comparison. Finally, the ICC falls back on its implied administrative authority. It says that if it doesn't have the express authority to do what it wants to do, which it plainly does not, that it still has the implied authority to do this. However, Your Honors, it is well established that agencies like the ICC have no common law power. Any claimed power must find its source in the statutes, and those statutes cannot be interpreted in a way that's inconsistent with their express provisions. Here, that is exactly what the ICC is doing by ignoring the definition of utility, by ignoring the definition of utility sourcing agreements, and by implication ignoring the definition of ARIES, and ignoring the definition of ARIES sourcing agreements. And I would add ignoring the definition of procurement plan as well. Moreover, there's no similar power granted that is the power to compel agencies to contract in the statutory scheme, from which we might reasonably infer that the ICC has the power that it claims here. The only similar power, again, relates to the initial clean coal facility, and there, very importantly, Your Honors, the legislature reserved that power to itself. It did not delegate that power to the ICC. It would be a very unusual reading of the statutory scheme if one were to conclude that the legislature chose not to delegate that narrower, that more limited authority to the ICC, but somehow by implication it meant to delegate this considerably broader power to the agency. You wanted eight minutes? Yes, Your Honor. I suggest you conclude now. Thank you, Your Honor. I would also add just very quickly that the implied power is not a trump card. It cannot be used to ignore the express terms of the statute, which is exactly what the agency is doing. Thank you. Sir, good morning. May it please the Court. Expressio unius est exclusio alterius. The expression of one thing is the exclusion of another. Chris Townsend, on behalf of the Coalition of Energy Suppliers, there is one and only one situation in which the Illinois Commerce Commission has been given the statutory authority to take the extraordinary step of compelling all alternative retail electric suppliers to enter into a specific sourcing agreement. That is when the contract is with an entity that is statutorily defined in Section 1-75d3 of the Illinois Power Agency Act as, quote, the initial clean coal facility, end quote. Section 16-115d5 sub 4 of the Public Utilities Act states, quote, all alternative retail electric suppliers shall execute a sourcing agreement to source electricity  and that section specifies that the sourcing agreement must include specific terms. If a retail electric supplier fails to enter into that sourcing agreement with the initial clean coal facility under Section 16-115d5 sub 6, the Commission can revoke that supplier's certification to operate in Illinois. There are no similar provisions to compel retail suppliers to enter into specific contracts with any other clean coal facilities. Excuse me. Sir, would you please be seated? People in the rows, move over. Make room for this gentleman. Excuse me. Please proceed. Thank you, Your Honor. Everyone agrees that the retrofitted clean coal facility known as FutureGen simply doesn't satisfy the statutory definition of the initial clean coal facility. Accordingly, the Illinois Commerce Commission has no authority to require competitive electricity suppliers to enter into the FutureGen sourcing agreement. The ICC's order, which treats FutureGen's retrofit facility as if it were an initial clean coal facility, should be reversed. Expressio unius, est exclusio ulterioris. Thank you. Good morning, Your Honor. May it please the Court, my name is Matthew Price on behalf of Commonwealth Edison Company. And you're taking how much time? Eight minutes, and I'd like to reserve two for rebuttal. Please proceed, sir. This case is a simple and straightforward case of statutory interpretation. Regardless of whether the Commission has the power to force ARIES, the alternative retail electric suppliers, into their own sourcing agreements with FutureGen, and that's an issue that my colleague has argued that ComEd takes no position on, it cannot force ComEd to enter into an agreement to procure power for ARIES customers, for other companies' customers. The statute is crystal clear that the Commission can require ComEd to procure power only for ComEd's own eligible retail customers. And that's a statutory defined term which refers to the customers, the small commercial and residential customers, that still continue to purchase electricity supply from ComEd rather than having chosen to enter the competitive market, just as they did in the old days before the Illinois General Assembly restructured the electricity industry in the state. And I just urge the Court to read the plain language of the statute so I can point the Court to those provisions in the statute which limit the Commission's authority over ComEd's procurement of power. Section 16-111.5A. What's the purpose of that provision in the statute, in your mind? Well, the purpose of the provision, Your Honor, is it's really rooted in the entire restructuring of the electricity industry in the state. Yeah, but what's the purpose? What's the root? Well, the IK Act was enacted in order to provide supervision for ComEd's procurement of electricity for these customers. The General Assembly was concerned that customers who hadn't chosen to enter the competitive market and were still buying electricity from ComEd, the General Assembly was concerned to make sure that those customers were getting a good deal on the electricity that they were buying from ComEd. And so it enacted this entire procurement process and created the IPA and created this procurement planning process in order to make sure that these eligible retail customers were getting a good deal on their electricity. That's the purpose of the procurement planning process. And so what the Commission has done here is taken that process, which was enacted for a very specific and narrow legislative purpose, and is trying to use that process to do something that the process was never intended to do, which is to force ComEd to buy electricity for the competitive retail supplier customers. That's not why the procurement planning process was enacted, and nothing in the statutes governing that process allow the Commission to do that. And that's made clear by the plain text of the statute. If you look at Section 16-111.5 of the Public Utilities Act, it states, an electric utility that served at least 100,000 customers in Illinois, that's ComEd, shall procure power and energy for its eligible retail customers in accordance with the applicable provisions. And further on in that section, it makes clear that, quote, those customers that are excluded from the definition of eligible retail customers shall not be included in the procurement plan load requirements, end quote, that the IPA is supposed to effectuate. Well, is there any notion that by putting that provision in the statute that they were trying to limit the ability of someone like, or some entity like, ComEd from monopolizing or putting a corner on the market to eliminate a source of energy to the alternate retailers? Well, ComEd doesn't control any energy. ComEd is simply an electric distribution company. It owns the wires and cable that deliver electricity to people, and then it continues to supply electricity that it buys on the marketplace under this very, the sort of limited. It supplies what it buys. It doesn't generate its own electricity. Right. It goes to the market just like any other electric supplier,  if those customers have opted to go to the competitive marketplace and buy from. Right. And their source of supply is limited to buying for resale only that which will service their customers so that they can't corner the market to the exclusion of their competitors. Correct? I mean, ComEd has no interest in corning the market because it earns no profit from its electricity supply business. It's not permitted to earn a profit on that aspect of its business. The only aspect of its business that it earns a profit from is the service of distributing electricity on its wire. So it has no interest in cornering the market. And the purpose of the provision was to make sure that, you know, when you're dealing with purchasing electricity supply for the eligible retail customers, there aren't the competitive marketplace pressures that would exist for the Ares. And so the IPA Act was set up. And if you look at the IPA Act and the legislative findings, it's very clear. The General Assembly wanted to make sure that in this regulated area of electricity supply, that's sort of a holdover from the old system, that competitors were getting a good deal. And so the IPA is supposed to supervise that procurement process. And that's why all the statutes are limited by their plain terms to the eligible retail customers of ComEd. Now, the commission seems to draw its authority from Section 1-75d5 of the IPA Act. This is the retrofit provision that the briefs refer to. And the commission's argument seems premised on the notion that this subsection is some sort of freestanding grant of authority with respect to clean coal facilities that can be read out of the context in which it appears. But the retrofit provision is just one subsection of the IPA Act, which on the whole is limited to procurement planning for eligible retail customers. Now, that section, Section 5d5, rather, does have two separate sentences in it. And one of them does talk about how the facilities, for example, FutureGen can propose, may propose to the agency, sourcing agreements with utilities and alternative electric suppliers. But in another sentence in that same section, it says the agency and the commission may approve any such utility sourcing agreements. And it doesn't say anything about the areas in the approval of the commission. And I'm concerned, on the one hand, you know, it's tempting to say, oh, it's just an ambiguous section. On the other hand, it's tempting to say it's not ambiguous. This is what the legislature definitely meant. They had the chance to put in areas in that second sentence, and they didn't. If they didn't put in the areas on purpose, but the areas are still required to buy clean coal, they can buy it from any source in the free market. They don't have to buy it from anybody that's required in any Illinois law, specifically FutureGen. Is that correct? I suppose that's the implication. And ComEd's argument is, wait a minute, wait a minute. We're responsible for eligible retail customers. We have an obligation to them. We have a statutory responsibility to the commission and, you know, through all these different interlocked bills to take care of them. And now the commission sort of arbitrarily has said to us, oh, and by the way, you're going to have to take care of all these areas' customers, too, even though ComEd is going to get paid for that. I'm wondering if we didn't miss an opportunity to have ComEd come to the table and voluntarily agree to do this for profit, but that ship is already gone, so it's too bad nobody thought of it. If ComEd has to take care of these areas' customers and do the sourcing agreements, the real rub is that it gives the commission authority to expand, according to ComEd, its legislative mandate away from the Illinois Power Agency Act, which controls only the utilities. So the commission, although it does have authority over areas, doesn't have sourcing agreement power over the areas. And because it doesn't have sourcing power over the areas, it certainly doesn't have sourcing power through ComEd to the areas. That's your argument? That's exactly right, Your Honor.  Thank you. If I may reserve the remainder of my time, Your Honor. Thank you, sir. FLE. You have 20 minutes. Feel free to use less if you'd like. Okay. Thank you, Your Honor. May it please the Court, good morning. Tom Stanton on behalf of the Illinois Commerce Commission. This case involves attempts by two groups of regulated entities to resist obligations under the clean coal law and frustrate the commission's efforts to implement the retrofitted clean coal statutory scheme consistent with the legislature's intent, policies, and goals. On one hand, you have the Aries, who despite a clear legislative mandate to source electricity from clean coal facilities, including retrofitted clean coal facilities, claim that the commission lacks the authority to require them to enter into sourcing agreement to fulfill that mandate. On the other hand, you have the utilities here, ComEd, who despite agreeing with the commission that the costs of the FutureGen project should be shared by both utilities and Aries in a competitively neutral manner, they claim that the procurement plans are limited to only its eligible retail customers and, therefore, the commission is prohibited from approving an efficient, fair, and reasonable cost recovery mechanism that recovers the costs of the FutureGen project from all its retail customers. Now, neither group has met its burden here to show that the commission's order is unlawful and, therefore, the order should be affirmed. I'd like to first address the challenge to the commission's authority to bind the Aries to the FutureGen sourcing agreement, and that's ICA's main argument. And after that, I'd like to address ComEd's challenge to the competitively neutral cost recovery mechanism. And then, finally, if time permits, discuss the Commerce Clause. So turning to ICA's appeal, the commission correctly found that it had the authority to require Aries to enter into a sourcing agreement with FutureGen. Two provisions are pertinent here. First is the Aries sourcing obligation. That's section 16.115.D5 of the Public Utilities Act. Now, that section unambiguously requires that the Aries source electricity from clean coal facilities, including clean coal facilities, quote, other than the initial clean coal facility. And that's 16.115.D subsection III. In fact, the legislature made this obligation unmistakable by requiring the Aries to agree to it as a condition of doing business in Illinois as an Aries. Now, a retrofitted clean coal facility is a subset of clean coal facilities, and, therefore, the Aries are required to source electricity from FutureGen, a retrofitted clean coal facility, up to an amount that doesn't exceed cost-based benchmarks that the commission approves each year. Second is the retrofit provision. That's section 175.D5 of the Illinois Power Agency Act. And the retrofit provision requires, as part of the procurement planning process, that the IPA and the commission shall consider sourcing agreements covering electricity generated by retrofitted clean coal facilities that were previously owned by Illinois utilities. It further provides that these new owners of the retrofitted clean coal facilities, they may propose to the IPA sourcing agreements with both utilities and Aries. And then it provides that the IPA and the commission may approve these sourcing agreements. Now, together, these provisions demonstrate that the commission is authorized to bind Aries as counterparties to the FutureGen sourcing agreement, and the power to approve includes the power to bind. Now, counsel for ISEA said that the term utility sourcing agreement is a defined term. That's incorrect. Neither utility or utility sourcing agreement is a defined term in the statute. Public utility is defined. Electric utility is defined. But in this case, the term, any such utility sourcing agreement, refers back and gives effect to the first two sentences of the statute. So, for example, when the IPA and the commission may approve any such sourcing agreements, it refers back to those sourcing agreements that the commission shall consider. There's no limitation on the types of sourcing agreements that the commission and the IPA shall consider. And second, in the second sentence, those new owners may propose to the IPA sourcing agreements with both utilities and Aries. The commission's interpretation gives effect to that provision. Now, on the other hand, the Aries interpretation inserts limitations, produces illogical results, and defeats the legislature's purpose in promoting clean coal electricity. So under their provision, if you read any such utility sourcing agreement as referring only to utilities, then that inserts a limitation in the first sentence where the IPA and the commission shall consider sourcing agreements. There's no limitation on that. And especially, and here's an important point, in the second sentence, where these new owners may propose to the IPA sourcing agreements with both utilities and Aries, well, if the new owners can propose sourcing agreements with the Aries, and the commission or the IPA can approve those agreements, what was the point? So they can't reconcile why the legislature would somehow deny the commission and deny the IPA the authority to approve those agreements that the statute specifically says that these new owners can propose to the IPA. Now, underlying the Aries position is the premise that they have unfettered discretion to pick and choose which clean coal facilities to source electricity from. But the Clean Coal Law changed that. It changed the status quo. So before the Clean Coal Law amendments in 2009, the Aries had discretion to choose to source or not source from clean coal facilities. But now 16.115.D5 of the Public Utilities Act requires that they source electricity from clean coal facilities. Now, the Aries also claim to find support for their position in principles of competition and the development of competitive markets here in Illinois. But why in the name of competition would the legislature impose a clean coal requirement on the utilities but not also on the Aries? They're competitors. What the Aries advocate is favorable treatment for themselves at the expense of the utilities. And the legislature rejected such asymmetric treatment by authorizing the IPA and the commission to approve sourcing agreements with both utilities and Aries. In addition, the Aries' singular focus on the goal of competitive markets ignores other legislative policies and goals regarding clean coal electricity. Now, the sourcing of clean coal electricity is a legislative mandate. This is what the legislature wanted. They sought to encourage the use of advanced clean coal technologies that capture and sequester carbon dioxide emissions to advance environmental protection goals. And they also sought to include electricity generated by clean coal facilities in a diverse electricity portfolio. And more generally, the legislature established the goal that 25 percent of the electricity used in Illinois shall be generated by cost-effective clean coal facilities by January 1, 2025. Now, the Aries position that they don't have a responsibility to source clean coal electricity, that undermines those policies and goals, and the commission's order promotes them. Is it possible that the future-gen lobbyists just missed the boat when they didn't write this bill right? No, I don't think so. I think if you can even look at the appellants appointed to the initial clean coal facility. And with respect to the initial clean coal facility, the legislature was clear that both the Aries and the utilities were to be responsible. Then what about when they get to the retrofit? Sure. The initial clean coal facility is rather unique in that the legislature established a detailed comprehensive scheme. I'm not talking about the initial one. We all agree that's gone. That's not even part of this issue. Right. Let's just talk about the retrofit. Sure. With the initial clean coal facility, the legislature reserved the authority to themselves to approve with respect to the retrofitted clean coal facility. The legislature delegated to the commission the authority to approve or not approve the sourcing. May approve such utility sourcing agreements. Where does it say Aries sourcing agreements? Right. The utility sourcing agreement, that's a reference to? The sentence before it. It's a reference to, it pertains to the sourcing agreements with? Well, but the sourcing agreements for clean coal just require clean coal in the free market. They don't require anything about Futurgen specifically. Right. That's the retrofit provision. In the retrofitted provision, Futurgen invoked the retrofit provision. That's section 175D5. And that provision, any such utility sourcing agreement refers to the sourcing agreements themselves with the retrofitted clean coal facilities that were previously owned by Illinois utilities. They're talking about those particular coal plants. And that's what that term utility sourcing agreement means. Because, as I said, otherwise you're going to get illogical results. You're not going to construe the statute in a holistic manner. You're just picking one sentence out of it. You're saying utility sourcing agreement. Utility is not defined. So utility sourcing agreement means the agreements themselves. And you can tell that from the title of the provision. It talks about, it refers to the, I apologize. While you're looking for that, can I just ask you? Sure. Sourcing agreements from the Illinois Power Agency generally have a five-year plan with a three-year sourcing agreement. This one has a five-year sourcing agreement. And that's because they recognize that Futurgen, if it doesn't have this contract in place for the year 2017, can't encourage investors and will probably just not ever be developed. Is that a correct statement? That's what Futurgen says in its PowerPoint. I believe it's a 20-year term. It's not a five-year term. It's a 20-year sourcing agreement. But that's correct. I think if they can't get the financing for it, then it may not be built. But the legislature clearly wanted these facilities to be retrofitted and put back in operation. As far as I can tell, all the parties agree that Futurgen's electricity is going to be more expensive than other comparable clean coal available in the market, understanding that this is the first technology of its kind. So there isn't anything really comparable to Futurgen anywhere else in the country at this moment. As far as I'm aware, as far as the record reflects, that's correct. So the ARIES people are saying, wait a minute, wait a minute, there's nothing that requires us to buy more expensive clean coal from Futurgen. We should be able to buy it on the free market. And nobody can point to where it says we have to buy it from Futurgen. Where does it say that? That would be in the retrofit provision. Only if you add in a word. Only if you word in the agency and the commission may approve any such utility and ARIES. We'd have to add in that word, sourcing agreements that do not exceed cost-based benchmarks. Well, I think, like I said, the term utility sourcing agreement means the actual agreement between the retrofitted clean coal facilities that were previously owned by the Illinois utilities. The utility sourcing agreement refers back to that these were, in fact, previously owned by Illinois utilities. Including Ameren, by the way. Yes, absolutely. Ameren, any other coal-fired plant in Illinois and out of state. It's not limited to in-state. So the fatal flaw in the ARIES position here is their creation of an artificial distinction between voluntary and involuntary sourcing agreements. And I see his reply brief at pages 8 and 9. They agree that the commission is authorized to approve a sourcing agreement that an ARIES voluntarily enters into with Futurgen. But they claim that the commission lacks authority to approve one against their will. That's the real issue. They don't disagree that they can voluntarily enter it and the commission can approve it. They're just saying that you can't force us to do it, but that's not correct. There's no voluntary, involuntary distinction in the retrofit provision. And actually, that flatly contradicts their proposed interpretation of the term utility sourcing agreement. For if the term utility sourcing agreement means only utilities, as they contend, and thus excludes the ARIES, where in Section 175d5 is this limited authority for the commission to approve only voluntary sourcing agreements? The answer, of course, is that the retrofit provision creates no artificial distinction. That's at pages 8, 9, and even 10 of their reply brief. So the approval authority in the retrofit provision applies to sourcing agreements with both utilities and ARIES, just as the commission said it did. So turning to ComEd's appeal, having found that it had the authority to approve a sourcing agreement with the utilities and the ARIES, the commission turned to the issue of cost recovery. So the retrofit provision requires that a sourcing agreement's contract price for electricity has to be set on a cost of service basis. Now, what that means is that the commission sets a revenue requirement to allow FutureGen to recover its cost, and then the commission determines how those costs are going to be recovered. This is a rate design and cost recovery issue, and the General Assembly has given the commission broad discretion with respect to rates and how costs should be recovered from customers. The commission could have required the utilities in 70 or so ARIES to each enter into their own sourcing agreement with FutureGen, but that would have been less efficient, create additional costs, that would ultimately be passed on to customers, and offer a less effective means of making sure that new ARIES that enter into the market over the 20-year term of the sourcing agreement, that they pay their proportionate share of FutureGen's costs. So you want ComEd to do your work? Well, no, it's not that we want ComEd to do our work. It's just that we think that the cost recovery mechanism, the tariff is an excellent mechanism to recover costs. The statute allows for it. ComEd will recover all their costs. The statute specifically allows ComEd to recover all the costs they incur in entering into these contracts. So would the amount of energy acquired under this scheme that the commission provides for in its work, is the gross amount of energy the same whether it's in two contracts or 72 contracts? No, the total would be the same. They have a maximum gross output of, I think, 168 megawatts. The net might be less. But, yeah, it would be spread out. It would really be just a cost recovery mechanism. I mean, essentially the output of FutureGen to these 70 independents, quote, and ComEd and Amgen would be the same. Well, actually, under the sourcing agreement, there's no physical delivery of electricity to any of these suppliers. So FutureGen's output is not physically delivered to ComEd. It's not physically delivered to any of the Ares. What happens is since it's a cost of service contract, FutureGen's entitled to its cost. What they're going to do is they're going to sell their electricity into the Midwest Independent System Operator, which is essentially the nonprofit organization that manages the transmission lines and the grid. So they're going to sell it into the market. They're going to get a market price. The revenues that they get from that will reduce the costs of service. So, yeah, the electricity is not going to be physically delivered to any of these suppliers. And that's an important point because that just shows that this sourcing agreement is essentially just a financial transaction. Wait. I'm sorry. I didn't mean to interrupt. Sure. Oh, okay. So it's a financial transaction where the commission sets a revenue requirement that will allow FutureGen to recover its cost. The electricity will be sold into the market to reduce the cost, and the cost will be distributed to all the Ares and ComEd's customers through a competitively neutral charge. Okay. I thought that the sourcing agreement acquired however it happened. In this case, the Ares having sourcing agreements that are taken over by ComEd and Ameren, the ultimate result is that the sourcing agreements will purchase all of FutureGen's electrical output. That's right. All of it. So FutureGen's electrical output is not going to be on MESO to be spread out around the rest of the Midwest. It's only going to be servicing Illinois customers. No. Under the sourcing contract, the FutureGen output will be sold into MESO. There will not be physical delivery. That's an important point, Your Honor, because ComEd talks about there's a one restriction in the statute that they want to rely on for their eligible retail customers, and they point to the following restriction. It's in Section 16111.5A, associated with the definition of eligible retail customer. And they say, quote, those customers that are excluded from the definition of eligible retail customers shall not be included in the procurement plan load requirements. But this restriction has no application to the FutureGen sourcing agreement because the FutureGen output is not included in the procurement plan load requirements. FutureGen's output will not have any impact on the load requirements. The amount of electricity, the load is the amount of electricity that's used by the customers. Because, as I mentioned, it's essentially a financial transaction. It doesn't produce any incremental load. What happens is they're just agreeing to pay the cost, whatever's left over, after that electricity is sold into the market. The revenues that FutureGen receives will just reduce the cost, and then that figure will be distributed to the customers through a competitively neutral charge. So that's an important point on the load requirements, because that's the only restriction that ComEd points to, to show that we can't do the cost recovery mechanism that we did. And, as I mentioned, it has no impact on the procurement plan load requirements, and that's an important point for the Court. ComEd also cites language provisions that pertain only to the initial clean coal facility. But the legislature, as your Honor mentioned, never enacted authorizing legislation for the initial clean coal facility, so those provisions aren't operable, and there's no comparable language in the retrofit provision. And ComEd also points to the rate cap in Section 175D2, but that's not a limitation on the Commission's power to adopt the cost recovery mechanism. Excuse me for interrupting. Sure. Two minutes. Okay. Just one other point on the retrofit provision. When the IPA procures electricity for the eligible retail customers, it does it through a competitive bidding process, and that section is Section 1611.5, subsection B, through subsection J. So when the IPA procures electricity for their eligible retail customers, they try to get the best price. The objective is to get the best price available for electricity, given the portfolio requirements at the time. But sourcing agreements are an entirely different animal, and the sourcing obligation were amendments in the 2009 Clean Coal Act. And as I mentioned, the retrofit provision requires that the contract be set on a cost of service basis. The cost is recovered from counterparties, and the sourcing is not subject to the competitive bidding process. So that's a fundamental difference between what the IPA does for eligible retail customers and the IPA's responsibilities and the commission's responsibility with respect to this clean coal mandate. It's a clean coal mandate from the legislature. They wanted to promote environmental goals, but they had the commission and the IPA do this during the procurement process. But it is fundamentally different from what the IPA does when it procures electricity for eligible retail customers. And in conclusion, for the reasons discussed here and in our briefs, the commission requests that the order be affirmed. Thank you, sir. Rebuttal. Thank you, Your Honors. Counsel for the ICC let off his argument by saying that the term utility sourcing agreement is not explicit. It's not expressly defined. I would direct the Court's attention to Section 1-10 of the IPA Act. That's 20 ILCS 3855-1-10, where it specifically defines sourcing agreement, saying sourcing agreement means, one, in the case of electric utilities, rather, an agreement between, and then it goes on with a rather lengthy explanation. And then, two, sourcing agreement means, in the case of an ARES, and then, again, it goes on with a rather lengthy explanation of what that means. The point is that those terms are specifically defined in the statutes, and they're separately and exclusively defined. The retrofit provision does say that the IPA has the ability to propose and consider sourcing agreements between ARES and the owners of retrofitted clean coal facilities, and that makes perfect sense. In designing a procurement plan and in determining utilities' needs and the needs of their eligible retail customers and what energy the IPA expects to be on the market in the future, the IPA obviously has to consider what the market is and will be doing. ARES now make up 80 percent of the retail market. So, of course, they can look out the window when they're deciding what utilities' needs are. I don't think those two provisions are inconsistent. And to the extent that they could be inconsistent, the legislature's expressly defined terms must trump. Further, counsel for the ICC said that it's ARES' position that we don't have to source clean coal electricity. Not 20 minutes ago, I conceded that we do. There's no question we have to source clean coal electricity. The point is we can do it as private entities operating on a competitive market on our own terms. That goes to the very heart of what an ARES is. What you didn't hear counsel for the ICC say, or rather doing, is quoting much of the statutes. And there's a reason for that. They're relying on their characterizations of those statutes, which respectfully are inaccurate. I think when you look to the language of the statutes themselves and the expressly defined terms, you'll see that none of what counsel for the ICC said is true. The ICC doesn't have the power to turn back the clock on the development of a competitive electric market in Illinois by blurring the lines between private entities, ARES, and public utilities, and in so doing, saddling Illinois rate payers, by the way, with over $650 million that FutureGen needs in private equity to get going. It doesn't have the power to favor a private interest in that way at the behest of the bigger coal companies in the world. I see it therefore asked that the ICC's orders be reversed, and that ARES' fundamental right, which is rooted in due process, to freedom of contract, be affirmed. Thank you. Thank you, Your Honors. I just have one point to make to follow up on a question that Justice Kuczynski asked earlier, which, as Justice Kuczynski noted, the statute refers to utility sourcing agreements. And my colleague from the ICC suggested that it doesn't have a definition in the statute. However, sourcing agreement is a defined term, and if you look at the definition it underscores why ComEd's position here is correct, that we cannot be forced to enter a contract to buy electricity for other people's customers. The definition of sourcing agreement is set forth in Section 1-10 of the IPA Act, and that definition says that a sourcing agreement for any clean coal facility, whether the initial clean coal facility or other clean coal facilities, has to contain the terms and conditions of Section 1-75D3. Now, this is complicated, but it's an important point. If you look at 175D3, that would appear to apply only to the initial clean coal facility, but the definition of sourcing agreement makes clear that any sourcing agreement has to have these terms. And among those terms set forth in D3B3 is the fact that the utility's obligation is limited to its share of the state's retail load. In other words, the General Assembly thought about this, it thought about what a utility sourcing agreement should include, and it concluded that a utility cannot be forced to purchase electricity for more than its share of the retail load, that is, for more than its own eligible retail customers. So I'd urge the Court to take a careful look at those statutory subsections. Thank you very much. Thank you. Thank you to all counsels involved. Your briefs were excellent, as was your oral presentation. The Court is going to take this case under advisement. This Court will be in recess for 10 minutes.